UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


**WILLIAM SCHMITT, JR., CHAD THOMPSON,
AND DEBBIE BLEWITT**,

                        Plaintiffs,


**v.**                                         **CASE NO.2:18-cv-966**

                                         Judge Edmund Sargus, Jr.

                                         Magistrate Judge Elizabeth Deavers


**JON HUSTED**,

in his Official Capacity as Ohio
Secretary of State, and

**CRAIG M. STEPHENS, PATRICIA NELSON,
DORIA DANIELS, AND ELAYNE J. CROSS**,

in their official capacities as members of the
Portage County Board of Elections,

                        Defendants.


**PLAINTIFFS' RESPONSE TO DEFENDANT-SECRETARY'S
BRIEF OPPOSING PLAINTIFFS' FIRST AMENDMENT
CHALLENGE TO OHIO'S GATEKEEPER MECHANISM**

This is a prospective action (both facially and as-applied) under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution.  Plaintiffs challenge Ohio's "gatekeeper mechanism" for ballot initiatives as an impermissible prior restraint.  *See* Opinion and Order, R. 22, at PAGEID # 162 ("The boards of elections are also required to 'determine whether the petition falls within the scope of authority to enact via initiative ….  This is known as the 'gatekeeper mechanism.'").  This gatekeeper mechanism is recognized and codified in three statutes, O.R.C. § 3501.11(K)(2), O.R.C. § 3501.38(M)(1)(a), and O.R.C. § 3501.39(A), which have been together interpreted by the Ohio Supreme Court to afford local election boards the power to decide which proposed initiatives are permissible (and thus entitled to ballot space) and those which are not.[1]

Ohio's gatekeeper mechanism for initiatives imposes an impermissible prior restraint because it vests discretion in local election officials to select initiatives for ballots without providing timely and meaningful judicial review.  *See*, *e.g*., *Freedman v. Maryland*, 380 U.S. 51, 58-59 (1965).  This Court in its September 19, 2018 Order directing that Plaintiffs' initiatives be restored to the Windham and Garrettsville ballots agreed in finding a "high likelihood of success on the merits." Opinion and Order, R. 22, at PAGEID # 168.  The Court explained that it could find

> no legitimate state interests in preventing an adequate legal remedy for petitioners denied ballot access by a board of elections. While the availability of mandamus relief is essentially a judicially imposed remedy when the law does not otherwise provide one, the high burden on petitioners to prove entitlement to an extraordinary remedy is no substitute for de novo review of the denial of a First Amendment right.

*Id*. at PAGEID # 168.

---

[1] Contrary to the Secretary's suggestion, *see* Secretary's Brief, R. 30, at PAGEID # 206, Plaintiffs do not challenge any other subsections or aspects of these statutes.  Plaintiffs' sole claim is that the gatekeeper mechanism these statutes create amounts to an unconstitutional prior restraint.

The Court observed that Ohio creates "an original cause of action for review of the board's decision [placing an initiative on the ballot] in the Ohio Supreme Court." *Id*. at PAGEID # 163. Meanwhile, "if the board or secretary rejects a petitioner's submission for a substantive reason, as in the administrative versus legislative divide, neither the Ohio Constitution nor state laws provide a remedy." *Id*. (citation omitted). "An aggrieved petitioner may seek a writ of mandamus," *id*., but that requires proving

> "(1) a clear right to the requested relief, (2) a clear legal duty on the part of the board to provide it, and (3) the lack of an adequate remedy in the ordinary course of the law." … When  the Ohio Supreme Court …  reviews a decision by a county board of elections, such court may only issue the writ if the board "engaged in fraud or corruption, abused its discretion, or acted in clear disregard of applicable legal provisions."

*Id*. at PAGEID # 164 (citations omitted). Without a legal right to de novo review, the Court correctly concluded, Ohio's gatekeeper mechanism violates the First Amendment.

The Court on October 4, 2018, with the consent of the parties, converted the Order into a Preliminary Injunction set to expire on November 7, 2018.[2] Order, R. 28. The Court directed the parties to file supplemental briefs to address whether its Preliminary Injunction should be extended beyond the close of the 2018 general election. *Id*.

## ARGUMENT

### I.      Prior Restraints are Facially Unconstitutional.

The Secretary argues that facial attacks are "'disfavored' by the courts." Secretary's Brief, R. 30, at PAGEID # 206. While this is true of many constitutional challenges, it is not true of those made under the First Amendment. "Although facial challenges to legislation are generally

---

[2] Windham's initiative passed by a vote of 237 to 206, while Garrettsville's initiative failed by a vote of 515 to 471. *See* Portage County General Election, Nov. 6, 2018, Summary Report, (https://www.co.portage.oh.us/sites/portagecountyoh/files/uploads/final_unofficial_results.pdf) (last visited Nov. 7, 2018).

disfavored, they have been permitted in the First Amendment context where the licensing scheme vests unbridled discretion in the decision maker and where the regulation is challenged as overbroad." *FW/PBS v. City of Dallas*, 493 U.S. 215, 223 (1990); *see also Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018) (successful facial challenge to Minnesota law banning political attire in polling place); *Lakewood v. Plain Dealer*, 486 U.S. 750, 759 (1988) (striking local ordinance as facial violation of First Amendment); *Kunz v. New York*, 340 U.S. 290, 290-91 (1951) (same); *Saia v. New York*, 334 U.S. 558 (1948) (same).

## II. Initiatives are Subject to First Amendment Scrutiny.

The Secretary claims that the First Amendment has no application to initiatives. *See* Secretary's Brief, R. 30, at PAGEID # 204. This is not true; courts – including the Supreme Court and the Sixth Circuit – have repeatedly ruled that the First Amendment applies to restrictions placed on initiatives. Just like candidates and news racks – neither of which has an absolute First Amendment right to exist – once a state allows initiatives it must comply with the First Amendment. *See*, e.g., *City of Lakewood v. Plain Dealer*, 486 U.S. 750, 757 (1988) (holding that once city chooses to allow news racks on sidewalks it cannot engage in prior restraints); *Nwanguma v. Trump*, 903 F.3d 604 (6th Cir. 2018) (candidate has First Amendment protection).

In *City of Cuyahoga Falls v. Buckeye Community Hope Foundation*, 538 U.S. 188, 196 (2003), for example, the Supreme Court emphasized the importance of popular measures and the protections the First Amendment provides:

> In assessing the referendum as a "basic instrument of democratic government," we have observed that "[p]rovisions for referendums demonstrate devotion to democracy, not to bias, discrimination, or prejudice." And our well established First Amendment admonition that "government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable," dovetails with the notion that all

> citizens, regardless of the content of their ideas, have the right to petition their
> government.

(Citations omitted). *See also Meyer v. Grant*, 486 U.S. 414, 421-22 (1988) ("circulation of a

petition involves the type of interactive communication concerning political change that is

appropriately described as 'core political speech'."); *Buckley v. American Constitutional Law

Foundation*, 525 U.S. 182, 186 (1999) ("[p]etition circulation [for initiatives] … is

'core political speech'") (citation omitted).

In *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 296-97 (6th Cir. 1993),

the Sixth Circuit stated that although "the right to initiate legislation is a wholly state-created

right," the First Amendment still restricts states to placing "nondiscriminatory, content-neutral

limitations on the plaintiffs' ability to initiate legislation."  *See also Committee to Impose Term

Limits on the Ohio Supreme Court and to Preclude Special Legal Status for Members of and

Employees of the Ohio General Assembly v. Ohio Ballot Board*, 885 F. 3d 443, 446 (6th Cir.

2018) (applying First Amendment to restriction on initiative).[3]

**III.     Ohio's Delegation of Discretion to Election Boards Fails First Amendment Scrutiny.**

In order for Ohio's gatekeeper mechanism to survive constitutional scrutiny, the Secretary

must convince the Court that the First Amendment does not apply -- <u>at all</u>. If Ohio's gatekeeper

---

[3] *Nevada Commission on Ethics v. Carrigan*, 564 U.S. 117 (2011), which is relied upon by the
Secretary, did not involve initiatives. The Court there merely ruled (as it has on many occasions,
*see*, *e.g*., *Garcetti v. Ceballos*, 547 U.S. 410 (2006)) that when elected officials act for
government, they are government: "a legislator's vote is the commitment of his apportioned
share of the legislature's power to the passage or defeat of a particular proposal. The legislative
power thus committed is not personal to the legislator but belongs to the people; the legislator
has no personal right to it." 564 U.S. at 125-26. Were Defendants correct, a candidate for office –
because she is using "governmental mechanics," *see* Secretary's Brief, R. 30, at PAGEID # 223 –
would necessarily be a state actor devoid of First Amendment protection. Of course, this is not
the case, as both the Supreme Court and the Sixth Circuit have recognized. *See*, *e.g*., *Libertarian
Party of Ohio v. Husted*, 831 F.3d 382, 396 (6th Cir. 2016).

mechanism is subject to <u>any</u> First Amendment scrutiny, it fails. This is so because it (1) vests <u>discretion</u> in executive agents to restrain speech, and (2) fails to authorize <u>de novo</u> <u>review</u> by Ohio's courts.

      **A.**      **Ohio's Gatekeeper Mechanism Is Content-Based.**

When a restraint on speech is content-based, the Sixth Circuit has ruled that "the law must survive strict scrutiny." *Déjà vu of Nashville v. Metropolitan Government of Nashville and Davidson County*, 274 F.3d 372, 391 (6th Cir. 2001); *see also Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015) ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."). "Systems of prior restraint," moreover, "will be upheld only if they provide for prompt judicial review of all decisions denying the right to speak, while also passing the appropriate level of scrutiny." *Déjà vu of Nashville*, 274 F.3d at 391 (citing *Freedman v. Maryland*, 380 U.S. 51, 58-59 (1965)).

In *Ohio Ballot Board*, 885 F. 3d at 447, in contrast, the Sixth Circuit concluded that because the <u>number</u> of subjects allowed in an initiative is concrete and content-neutral, Ohio's single-subject rule passes First Amendment muster. The Sixth Circuit explained:

> Ohio's single-subject rule does not prohibit certain types of constitutional amendments based on the topics or ideas contained in those amendments. … [W]hether Plaintiffs violate Ohio's single-subject rule depends not on what they say, but simply on where they say it—in one initiative petition or in two.

*Id*. at 448. Had Ohio's law either been content-based or lacked concrete criteria, the Sixth Circuit's language implies that its analysis would have changed. Strict scrutiny would have been employed.[4] Further, the doctrine against prior restraints would have had to have been addressed.[5]

Ohio's delegation of authority under its statutory gatekeeper mechanism is not content-neutral and does not employ concrete criteria to limit executive discretion.  It instead requires that executive officials exercise discretion while focusing on the subject and content of proposed ordinances to decide which to allow and which to restrain. Elections officials decide "which actions are administrative and which are legal." Opinion and Order, R.22, at PAGEID # 162 (quoting *State ex rel. Walker v. Husted*, 144 Ohio St.3d 361, 43 N.E.3d 419, 423 (2015)). "Administrative actions are not appropriate for the initiative process; legislative actions are." *Id*. at PAGEID # 162-63 (citations omitted). In the present case, for example, the Portage County Board of Elections rejected the very same initiatives that at least three other local election boards had certified as proper. *See* Verified Complaint, R.1, at PAGEID # 8 & R.1-5, R.1-6, R.1-7. This demonstrates that the administrative versus legislative distinction is a far cry from concrete.

---

[4] In a case the Sixth Circuit relied upon, *Biddulph v. Mortham*, 89 F.3d 1491, 1493, 1500 (11th Cir. 1996), the Eleventh Circuit sustained a content-neutral requirement that explanatory statements not exceeding 75 words and titles not exceeding 15 words be included with initiatives. The Eleventh Circuit cautioned, however, that it "would be concerned about free speech and freedom-of-association rights were a state to enact initiative regulations that were content based or had a disparate impact on certain political viewpoints." *Id*. at 1500.

[5] Because the single-subject rule in *Ohio Ballot Board* was concrete and objective, there was no reason for the Sixth Circuit to address procedural safeguards.  A single, concrete numerical rule is the exact opposite of executive discretion. In *Thomas v. Chicago Park District*, 534 U.S. 316, 322 (2002), which is discussed at page 13, *infra*, the Court ruled that a content-neutral permit scheme that employed concrete criteria (rather than leaving discretion in the decision maker) did not need to meet *Freedman v. Maryland*'s procedural safeguards.

*Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015), demonstrates how courts should distinguish between content-based and content-neutral restrictions on speech:

> Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys. Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny.

(Emphasis added).  Applying this commonsense approach to the sign code at issue in that case, the Court concluded that it was plainly content-based:

> It defines 'Temporary Directional Signs' on the basis of whether a sign conveys the message of directing the public to church or some other 'qualifying event.' It defines 'Political Signs' on the basis of whether a sign's message is 'designed to influence the outcome of an election.'  And it defines 'Ideological Signs' on the basis of whether a sign 'communicat[es] a message or ideas' that do not fit within the Code's other categories.

*Id*.

Using this same commonsense approach here, it is evident that Ohio's delegation of discretion to local boards of elections relies on the subject matter and content of the proposed initiative. An initiative serving "administrative" goals or "exceeding the scope" of local governmental power, as determined by the elections officials, is improper.  "Legislative" matters, in contrast, are proper subjects for the ballot. What is administrative and what is legislative, unfortunately, remains a "difficult" distinction -- even for Justices of the Ohio Supreme Court. *See*, *e.g*., *State ex rel. Flak v. Betras*, 152 Ohio St.3d 244, 247, 95 N.E.3d 329, 332 (2016) (stating that "it is sometimes difficult to distinguish").

Ohio has failed to prove that its gatekeeper mechanism is necessary to achieve a compelling end. Many states that allow initiatives eschew Ohio's approach in favor of less-burdensome alternatives. *See* page 15, *infra*. Given alternatives, Ohio cannot meet strict scrutiny.

**B.      Ohio's Gatekeeper Mechanism Is A Prior Restraint.**

Assuming that Ohio could meet strict scrutiny, its law still must fail as an impermissible prior restraint. A "'prior restraint' exists when the exercise of a First Amendment right depends on the prior approval of public officials." *Déjà vu of Nashville*, 274 F.3d at 400 (citations omitted). "Any system of prior restraints comes to this Court bearing a heavy presumption against its constitutional validity." *Id*. (quoting *Freedman*, 380 U.S. at 57) (emphasis added).

Laws that grant discretion to executive agents without concrete guidance -- like Ohio's -- are the quintessential examples of prior restraints. In *Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969), for example, the Supreme Court struck down a Birmingham demonstration permit requirement because it "conferred upon the City Commission virtually unbridled and absolute power to prohibit any 'parade,' 'procession,' or 'demonstration' on the city's streets or public ways." *Id*. at 150 (footnote omitted). The Court stated:

> This ordinance as it was written fell squarely within the ambit of the many decisions of this Court over the last 30 years, holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional.

*Id*. at 150-51 (footnote omitted) (emphasis added).

In *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1990), which invalidated a parade permit requirement, the Court reiterated this principle: "A government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'" (Citations omitted). "To curtail that risk, 'a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license' must contain 'narrow, objective, and definite standards to guide the licensing authority.'" *Id*. (quoting *Shuttlesworth*).

8

The Court in *City of Lakewood v. Plain Dealer*, 486 U.S. 750, 757 (1988), similarly invalidated as an impermissible prior restraint a city's permitting scheme for news racks placed on public property: "At the root of this long line of precedent is the time-tested knowledge that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." (Citations omitted).[6]

The Secretary argues that Ohio's licensing scheme is proper because it does not place unbridled discretion in the hands of executive officials. Ohio's distinction between "administrative" and "legislative" matters, the Secretary claims, "sets explicit limits on the discretion of county elections officials to deny ballot access." *See* Secretary's Brief, R.30, at PAGEID # 229.

The Secretary is wrong. Far from setting clear, concrete, explicit limits, Ohio asks its elections officials to draw complicated legal conclusions. Complex legal conclusions are the antitheses of clear, concrete and neutral guidelines. The Supreme Court's recent decision in *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018), makes this clear -- even in the context of subsequent punishment imposed on speech in a non-public forum.[7] There, Minnesota forbad any person from wearing a "political badge, political button, or other political insignia …

---

[6] The Court also explained why a facial challenge is the proper way to challenge prior restraints: "the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused. *Id*.

[7] Because prior restraints are particularly noxious, they are invalid even when subsequent punishment is permitted. *See Kunz v. New York*, 340 U.S. 290, 295 (1951). Consequently, because subsequent punishment using the standard in *Mansky* was impermissible, a prior restraint under this same kind of standard would necessarily be unconstitutional.

at or about the polling place." *Id*. at 1883. "Minnesota election judges—temporary government employees working the polls on Election Day—have the authority," the Supreme Court explained, "to decide whether a particular item falls within the ban." *Id*. While the election judges could not restrain the offensive attire, they were empowered to initiate punitive proceedings after-the-fact.

The Supreme Court ruled that because Minnesota failed to "articulate some sensible basis for distinguishing what may come in from what must stay out." *id*. at 1888, its law facially violated the First Amendment. The Court explained:

> the unmoored use of the term "political" in the Minnesota law, combined with haphazard interpretations the State has provided in official guidance and representations to this Court, cause Minnesota's restriction to fail even this forgiving test [applied to speech in non-public fora].

*Id*. Of particular note, the Court pointed to the legal nature of the distinctions Minnesota asked its election judges to draw; they "pose[d] riddles that even the State's top lawyers struggle to solve." *Id*. at 1891.

Ohio's gatekeeper mechanism fails First Amendment scrutiny for the same reasons as Minnesota's ban on "political" attire in the polling booth. Ohio's law fails to "articulate some sensible basis for distinguishing" proper from improper speech. Ohio elections officials, like Minnesota's, are required to answer legal "riddles that even the State's top lawyers struggle to solve." Ohio's distinction is far from clear and concrete. It is at least as constitutionally objectionable as Minnesota's; indeed, because Ohio's is a prior restraint it is even more objectionable.

10

### C. Ohio Does Not Employ Proper Procedural Safeguards.

Ohio's gatekeeper mechanism also fails First Amendment scrutiny because it fails to incorporate the procedural safeguards mandated by the Supreme Court in *Freedman v. Maryland*, 380 U.S. 51 (1965). In particular, Ohio does not provide immediate de novo judicial review, a failure that is fatal to any permitting system that is applied to speech.

Supreme Court and Sixth Circuit precedent make clear that *Freedman v. Maryland*, 380 U.S. 51 (1965), requires that a state must not only limit the discretion afforded executive agents to restrain speech with concrete, objective standards, it must also provide prompt, de novo[8] judicial review. *See Bose v. Consumers Union, Inc.*, 466 U.S. 485, 508 n.27 (1984) ("The simple fact is that First Amendment questions of 'constitutional fact' compel this Court's de novo review."); *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 892 (6th Cir. 2000) ("theoretical possibility of expeditious judicial review is not constitutionally sufficient. A guarantee of prompt judicial review is necessary ...."); *Universal Film Exchange, Inc. v. City of Chicago*, 288 F. Supp. 286, 293 (N.D. Ill. 1968) ("Since *Freedman v. State of Maryland*, it has been clear that only a de novo judicial determination that a motion picture is unprotected by the First Amendment can justify a valid final restraint of a motion picture in advance of exhibition."). Last, state officials must bear the burden of seeking judicial review.

The Sixth Circuit in *Déjà vu of Nashville*, 274 F.3d at 400, explained these procedural safeguards in the context of zoning restrictions:

---

[8] *See* Henry P. Monaghan, *First Amendment "Due Process*," 83 HARV. L. REV. 518, 526 (1970) ("*Freedman* requires only that the court make a separate, independent judgment on the administrative record."); Note, Allan Tanambaum, *"New and Improved": Procedural Safeguards for Distinguishing Commercial From Non-Commercial Speech*, 88 COLUM. L. REV. 1821, 1825 n.3 (1988) ("*Freedman* seems to insist on de novo judicial review.").

> In *Freedman,* a unanimous Supreme Court found that three procedural safeguards were required for a prior restraint scheme to avoid constitutional infirmity. First, the decision whether or not to grant a license must be made within a specified, brief period, and the status quo must be preserved pending a final judicial determination on the merits. Second, the licensing scheme "must also assure a prompt judicial decision, to minimize the deterrent effect of an interim and possibly erroneous denial of a license." Third, the licensing scheme must place the burden of instituting judicial proceedings and proving that expression is unprotected on the licensor rather than the exhibitor.

(Citations omitted).

After observing that "[l]icensing schemes in a city ordinance regulating sexually oriented businesses constitute a prior restraint that must incorporate at least the first two *Freedman* procedural safeguards," *id.* at 400-01 (citations omitted), the Sixth Circuit concluded that Tennessee's common-law review process did not satisfy the first *Freedman* requirement: "Whether the common law writ of certiorari will issue is a matter of discretion. It is not issued as a matter of right." *Id.* (citation omitted). "Thus, the Ordinance, in requiring that aggrieved applicants proceed to court via a discretionary route, fails to guarantee a 'final judicial adjudication on the merits,' as required under *Freedman* 's first safeguard." *Id.*

Ohio's gatekeeper mechanism fails for all of these reasons. Applying the first two *Freedman* requirements, Ohio law does not maintain the status quo "pending a final judicial determination on the merits." Instead, Ohio's framework allows local elections boards to upset the status quo and remove initiatives that have previously been certified. Next, the only judicial review that does come in Ohio's Supreme Court is by way of mandamus – a writ of last resort. As explained by this Court in its September 19, 2018 Order, it is not de novo and is not a matter of statutory or constitutional right. Last but not least, the burden of seeking mandamus is impermissibly placed on the speaker.

IV.    **Even Assuming that Ohio's Gatekeeper Mechanism Were Content-Neutral It Would Still Constitute An Impermissible Prior Restraint.**

Many of the Supreme Court's prior restraint precedents involve content-neutral time, place and manner restrictions. In *City of Lakewood v. Plain Dealer*, 486 U.S. 750, 757 (1988), for example, the city restricted news racks on public property. There was no claim that the city restricted news racks based on content.  Rather, the restriction was a content-neutral time, place and manner restriction. Still, the Supreme Court applied its prior restraint jurisprudence to invalidate <u>how</u> the city limited news racks: "even if the government may constitutionally impose content-neutral prohibitions on a particular manner of speech, it may not *condition* that speech on obtaining a license or permit from a government official in that official's boundless discretion." *Id*. at 774.

Contrary to the Secretary's claim, *see* Secretary's Brief, R.30, at PAGEID # 226, the Supreme Court only reiterated this point in *Thomas v. Chicago Park District*, 534 U.S. 316, 323 (2002):

> Of course even content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression. Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content. We have thus required that a time, place, and manner regulation contain adequate standards to guide the official's decision and render it subject to effective judicial review.

(Citations omitted).[9] The question is whether Ohio has truly limited executive discretion with concrete, definite, and neutral criteria. As explained above, it has not. For this reason alone it has imposed an impermissible prior restraint.

---

[9] *See also Six Star Holdings v. City of Milwaukee*, 821 F.3d 795, 799 (7th Cir. 2016) ("Prior restraints that are viewpoint- and content-neutral and impose a limitation only on the time, place, and manner of speech are more likely to pass muster. They are permissible if, and only if, there

**V.     Treating Its Initiative Process as a Non-Public Forum Does Not Cure Ohio's Law.**

The Secretary argue that initiatives, like polling places, are non-public fora. *See* Secretary's Brief, R.30, at PAGEID # 223 (citing *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018).[10] Restraints in a non-public forum, however, are subject to the same procedural protections applied to prior restraints in more traditional public settings. Calling Ohio's initiative a non-public forum does not cure its violation of the doctrine against prior restraints.

The Sixth Circuit made this clear in *Miller v. City of Cincinnati*, 622 F.3d 524, 528 (6th Cir. 2010), which invalidated under the First Amendment a city's rule (Administrative Regulation # 5) that delegated discretion to "Department Heads" to decide who should be allowed to solicit in municipal buildings. Although the interior of a public building was "at most, a limited public forum," *id*. at 535,[11] the Sixth Circuit applied established prior restraint doctrine:

> This distinction is irrelevant, however, because in *City of Lakewood* the Court held that an arbitrary prior restraint on protected speech provides standing regardless of the forum. Hence, when a plaintiff's protected-speech activities are subject to restriction at the government's unfettered discretion, the plaintiff has suffered an injury in fact.

*Id*. at 528. *See also Barrett v. Walker County School District*, 872 F.3d 1209, 1226 (11th Cir. 2017) ("the unbridled-discretion doctrine can serve the same purpose in a limited public forum that it serves in a nonpublic forum: combating the risk of unconstitutional viewpoint

---

are procedural safeguards that ensure that the decision maker approving the speech does not have 'unfettered discretion' to grant or deny permission to speak.").

[10] As explained above, *Mansky* supports Plaintiffs' First Amendment claim by demonstrating that legal determinations are too confusing to expect elections officials to use them to punish or restrict speech.

[11] Non-public and limited public fora are subject to the same test: restrictions must be reasonable and viewpoint neutral. *See Miller*, 622 F.3d at 535-36 ("government limitations on speech in both a limited public forum and a nonpublic forum receive the same level of scrutiny. In both instances, any restrictions must be "reasonable and viewpoint neutral.").

discrimination. Naturally, then, the unbridled-discretion doctrine applies in a limited public forum."); *Amandola v. Town of Babylon*, 251 F.3d 339, 344 (2d Cir. 2001) (same).

Consequently, even assuming Ohio's initiative is the equivalent of a non-public forum, its vesting discretion in executive officials constitutes an impermissible prior restraint.

## VI. No Gateway Mechanism Like Ohio's Has Survived First Amendment Scrutiny.

Contrary to the Secretary's claim, no court has sustained an executive pre-election clearance mechanism for initiatives like the one used in Ohio. One reason for this is that few states delegate this breadth of discretion to executive officials. A number of states, like Nevada, California, and Washington, prohibit elections officials altogether from addressing whether the content or subject of initiatives is proper. *See Las Vegas Taxpayer Accountability Committee v. City Council of City of Las Vegas*, 125 Nev. 165, 174 & n.2, 208 P.3d 429, 435 & n.2 (2009) (holding that Nevada election officials do not have this authority and noting that neither do officials in California and Washington) (citations omitted).

Other states authorize executive officials (like attorneys general) to render "non-binding advice on the form or substance" of initiatives to their proponents. *See* Scott L. Kafker & David A. Rusccol, *The Eye of the Storm: Pre-election Review By The State Judiciary of Initiative Amendments to State Constitutions*, 2012 MICH. ST. L. REV. 1279, 1291 (footnotes omitted). Some allow executive pre-election review for "the form of the amendment," but "defer[] questions of substance" until after elections. *Id*. (footnote omitted). And others "require a more searching review to ensure that the amendment meets subject-matter and other substantive and procedural requirements," but unlike Ohio do this "before time, energy, and money are spent on gathering signatures." *Id*.

A few states authorize executive agents to make initial decisions about whether "a proposed amendment, or its title or summary" is proper; but those that do generally provide "expedited judicial review." *Id.* (footnote omitted). States that vest discretion in elections officials alone (without de novo review) to decide whether the subjects of initiatives are proper are rare.  And those states that do (or did) this, like Maine and New York, have found their processes seriously and successfully challenged under the First Amendment. *See Wyman v. Secretary of State*, 625 A.2d 307, 309 (Me. 1993); *Herrington v. Cuevas*, 1997 WL 703392 * 9 (S.D.N.Y. 1997) (Sotomayor, J.) (reviewing New York's law which allowed election clerks to decide whether a popular measure presented a proper subject and directing the parties to brief whether the law was content-based and subject to strict scrutiny).[12]

In *Wyman*, 625 A.2d 307, Maine did what Ohio does now; it delegated to its secretary of state the authority to decide whether the subject of an initiative was proper before allowing it on the ballot. Using this gateway mechanism, a citizen (Wyman) submitted an initiative only to have it rejected by the secretary based on its content: "the Secretary informed Wyman that he was disapproving circulation to the voters of the petition form as presented because the initiative if enacted would, in his opinion and that of the Attorney General, be unconstitutional." *Id.*

The Supreme Judicial Court of Maine ruled that vesting this sort of authority in an executive officer violated the First Amendment:

> The potential invalidity of the subject of an initiative petition, however, is not a sufficient reason to pre-empt the petition process itself or to bar the discussion of the issues raised in the petition.  Moreover, the Secretary's concerns of voter confusion and wasted resources if potentially invalid questions are included on the ballot are not implicated during the initial signature collection phase. Because the petition process is protected by the first amendment and the Secretary has advanced no compelling interest in executive

---

[12] The *Herrington* case was eventually dismissed as moot on March 6, 2002 after being reassigned to another judge.  No decision was ever rendered.

> oversight of the content of the petition prior to its circulation for signature, his refusal to furnish the petition form based on the content of the proposed legislation impermissibly violated Wyman's rights protected by the first amendment.

*Id.* at 312 (emphasis added).

In contrast to *Wyman*, the cases cited by the Secretary are inapposite for at least three reasons: they either (1) sustained content-neutral laws like those restricting the number of subjects, initiatives or voters required to place matters on ballots; (2) addressed whether governments may vertically apportion powers between superior and inferior governmental bodies (they can); or (3) sustained procedures that are different from those found in Ohio.

*Jones v. Markiewicz-Qualkinbush*, 892 F.3d 935 (7th Cir. 2018), falls squarely into the fist category. Like the Sixth Circuit's decision in *Ohio Ballot Board*, 885 F. 3d 443, *Jones* sustained a concrete, content-neutral restriction on the number (three) of initiatives that may be certified to a ballot. *See also Initiative & Referendum Institute v. Walker*, 450 F.3d 1082 (10th Cir. 2006) (rejecting challenge to content-neutral supermajority requirement for initiatives).[13]

*Marijuana Policy Project v. United States*, 304 F.3d 82 (D.C. Cir. 2002), is in the second category. It holds that government may vertically apportion powers within its branches. Far from deciding whether an executive gatekeeper mechanism for initiatives constitutes an impermissible prior restraint,[14] the court addressed only whether "the First Amendment restrict[s] Congress's

---

[13] *Aye v. Mahoning County Board of Elections*, 2008 WL 554700 (N.D. Ohio 2008), likewise involved concrete, content-neutral requirements (*e.g.*, education, experience, term limits) placed on candidates: "[Ohio law] does not give discretionary authority to the Sheriff … and clearly defines the threshold requirements that any candidate for office must satisfy."*Palisade FruitLands v. Todd*, 279 F.3d 1204 (10th Cir. 2002), rejected an equal protection challenge to a Colorado law that allowed voters in some but not all counties to use initiatives. It had nothing to do with how elections officials selected initiatives for ballots.

[14] Further, the plaintiffs in *Marijuana Policy Project* did not challenge any discretion vested in executive officers to pick and choose initiative topics; they instead argued that a well-defined

ability to withdraw the District [of Columbia's] authority to reduce marijuana penalties?" *Id*. at 85. "Congress [under the Barr Amendment] denied the District authority to 'enact ... any law' reducing penalties associated with possession, use, or distribution of marijuana." *Id*. at 83. The challengers claimed that whether pre- or post-election, Congress was precluded by the First Amendment from restricting the District's power to regulate marijuana. The court disagreed: "The Barr Amendment merely requires that, in order to have legal effect, their [i.e., voters'] efforts must be directed to Congress rather than to the D.C. legislative process." *Id*. at 270.[15]

   *Port of Tacoma v. Save Tacoma Water*, 422 P.3d 917 (Wash. App. 2018), falls into the third category. Washington denies to executive officials the authority to decide what is and what is not a proper subject for initiatives. Its process is therefore unlike Ohio's. The question in *Save Tacoma Water* was whether a <u>court</u> could, consistent with the First Amendment, conclude before an election that an initiative is improper. *Id*. at 920.[16] In *Save Tacoma Water*, a pre-election <u>judicial</u> challenge to an initiative was bought by groups who wanted to keep an initiative off a ballot. *Id*. They were properly saddled with the burden of going to court. More importantly, the <u>court</u> there was not deferring to a pre-election executive decision; it was acting de novo. Given this procedural posture, the court in *Save Tacoma Water* was perfectly justified in addressing whether the initiative at issue fell outside the scope of the state's initiative process.

_____

subject could not be reserved to the Congress. Because the prohibited subject in *Marijuana Policy Project* was well-defined, it left no discretion at all in ballot officials.

[15] Plaintiffs here do not challenge Ohio's authority to apportion authority over any subject -- let alone marijuana -- between the State and its local subdivisions. Plaintiffs concede that Ohio has that authority; the First Amendment does not mandate anything to the contrary.

[16] Plaintiffs do not deny that a <u>court</u> can, in an action instituted by a censor, do exactly that (assuming the *Freedman* safeguards are otherwise met).

*Wirzburger v. Galvin*, 412 F.3d 271 (1st Cir. 2005), likewise falls into this third category. There, the court sustained Massachusetts' pre-election review process for initiatives that vested initial review authority in the state attorney general. That process differed from Ohio's in three important ways: (1) the attorney general had no discretion; (2) the excluded subjects were specifically defined, "including, *inter alia,* appointment or compensation of judges; the powers, creation or abolition of the courts; and specific appropriation of state money," *id.* at 275; and (3) the decision was subject to de novo judicial review before the election. *See Mazzone v. Attorney General*, 432 Mass. 515, 520, 736 N.E.2d 358, 364 (2000) ("Our review of that certification is de novo.") (citation omitted).  After ruling that the law was subject to First Amendment scrutiny, the court concluded it was content-neutral and passed intermediate scrutiny. *Wirzburger*, 412 F.3d at 276. Because immediate de novo review was available under Massachusetts law, *Freedman* was never raised and could not have been violated.[17]

## VII.    The Balance of Equities Weighs in Favor of Continuing the Previously Ordered Preliminary Relief.

In its initial temporary restraining order returning Plaintiffs' two proposed ordinances to the Windham and Garrettsville ballots, the Court ruled that "Plaintiffs have a high likelihood of success on the merits."  Opinion and Order, R.22 at PAGEID # 168.  That remains true; nothing has changed since that Order was issued and nothing has changed following the election. No relevant intervening decisions have been handed down.

---

[17] *Skrypzak v. Kauger*, 92 F.3d 1050 (10th Cir. 1996), is similar in that it involved a state law that authorized pre-election, de novo judicial review of initiatives. The challengers claimed that the Oklahoma Supreme Court's authority to review initiatives before elections violated the First Amendment. The Tenth Circuit dismissed it on standing grounds, a conclusion that was later overturned by *Initiative & Referendum Institute v. Walker*, 450 F.3d 1082 (10th Cir. 2006).

Plaintiffs, meanwhile, are threatened with the same substantial and irreparable harm.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). "Ohio's regulatory scheme," this Court correctly concluded in its prior Order, "unreasonably infringes on Plaintiffs' First Amendment rights by allowing an executive board to determine disputed legal and even constitutional issues, thereby potentially blocking initiatives from the ballot, and then denying rejected petitioners a right to review." *Id*. at PAGEID # 169.

Ohio's unconstitutional restriction continues to cause Plaintiffs irreparable harm following the 2018 election. Plaintiffs seek to place similar ordinances on municipal ballots through Ohio's initiative process as early as the May 7, 2019 election. *See* Declaration of Plaintiff-Schmitt (Exhibit 1); Declaration of Plaintiff-Thompson (Exhibit 2).[18] Plaintiffs in the absence of injunctive relief will be forced to submit their initiatives for executive review under Ohio's gatekeeper mechanism on or around February 19, 2019. Time remains of the essence even though the 2018 election is complete. As this Court previously observed, "the public is unlikely to suffer significant harm from the injunctive relief that Plaintiffs seek." Opinion and Order, R.22, at PAGEID # 170. For this and the reasons expressed above, preliminary injunctive relief should be continued until final judgment is rendered.

## CONCLUSION

Plaintiffs respectfully request that continuing preliminary relief be **GRANTED.**

---

[18] Ohio law does not preclude the placement of initiatives on local ballots during odd-year primary election cycles.  *See generally* JON HUSTED, OHIO SECRETARY OF STATE, OHIO BALLOT QUESTIONS AND ISSUES HANDBOOK 6-16 (July 2018) (https://www.sos.state.oh.us/globalassets/elections/eoresources/general/questionsandissues.pdf) (last visited, Nov. 8, 2018).

Respectfully submitted,


s/*Mark R. Brown*

Mark R. Brown, Trial Counsel
Ohio Registration No. 81941
303 East Broad Street
Columbus, OH 43215
(614) 236-6590
(614) 236-6956 (fax)
mbrown@law.capital.edu

Mark G. Kafantaris
Ohio Registration No. 80392
625 City Park Avenue
Columbus, Ohio 43206
(614) 223-1444
(614) 300-5123(fax)
mark@kafantaris.com


## <u>CERTIFICATE OF SERVICE</u>

I certify that this Response was filed using the Court's electronic filing system and thereby will be served on all parties to this proceeding.


s/*<u>Mark R. Brown</u>*
Mark R. Brown