# UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  August 07, 2019

Mr. Mark R. Brown
Capital University Law School
303 E. Broad Street
Columbus, OH 43215

Mr. Stephen P. Carney
Mr. Benjamin Michael Flowers
Mr. Michael Jason Hendershot
Office of the Attorney General of Ohio
30 E. Broad Street, 25th Floor
Columbus, OH 43215

Mr. Mark G. Kafantaris
625 City Park Avenue
Columbus, OH 43206

Re: Case No. 19-3196, *William Schmitt, et al v. Frank LaRose*
Originating Case No. : 2:18-cv-00966

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. Richard W. Nagel

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0189p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

WILLIAM T. SCHMITT; CHAD THOMPSON; DEBBIE BLEWITT,

　　　　　　　　　　*Plaintiffs-Appellees,*

　　　*v.*

FRANK LAROSE, Ohio Secretary of State,

　　　　　　　　　　*Defendant-Appellant.*

No. 19-3196

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:18-cv-00966—Edmund A. Sargus, Jr., Chief District Judge.

Argued:  June 26, 2019

Decided and Filed:  August 7, 2019

Before:  CLAY, WHITE, and BUSH, Circuit Judges.

———————————

## COUNSEL

**ARGUED:**  Benjamin M. Flowers, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant.  Mark R. Brown, CAPITAL UNIVERSITY LAW SCHOOL, Columbus, Ohio, for Appellees.  **ON BRIEF:**  Benjamin M. Flowers, Michael J. Hendershot, Stephen P. Carney, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant.  Mark R. Brown, CAPITAL UNIVERSITY LAW SCHOOL, Columbus, Ohio, Mark G. Kafantaris, Columbus, Ohio, for Appellees.

　　　　WHITE, J., delivered the opinion of the court in which CLAY, J., joined, and BUSH, J., joined in part.  BUSH, J. (pp. 15–26), delivered a separate opinion concurring in part and in the judgment.

No. 19-3196                           *Schmitt, et al. v. LaRose*                           Page 2

———————————

## OPINION

———————————

HELENE N. WHITE, Circuit Judge.  Plaintiffs William T. Schmitt and Chad Thompson submitted proposed ballot initiatives to the Portage County Board of Elections that would effectively decriminalize marijuana possession in the Ohio villages of Garrettsville and Windham.  The Board declined to certify the proposed initiatives after concluding that the initiatives fell outside the scope of the municipalities' legislative authority.  Plaintiffs then brought this action asserting that the statutes governing Ohio's municipal ballot-initiative process impose a prior restraint on their political speech, violating their rights under the First and Fourteenth Amendments.  The district court issued a permanent injunction against the Portage County Board of Elections and Defendant Frank LaRose, in his official capacity as the Secretary of State of Ohio, prohibiting the enforcement of the statutes in any manner that failed to provide adequate judicial review.  Defendant LaRose now appeals.

Because the Ohio statutes at issue do not violate Plaintiffs' First or Fourteenth Amendment rights, we **REVERSE** the district court's order and **VACATE** the permanent injunction.

## I.

The Ohio Constitution reserves the power of legislation by initiative "to the people of each municipality on all questions which such municipalities may now or hereafter be authorized by law to control by legislative action."  Ohio Const. art. II, § 1f.  "Because citizens of a municipality cannot exercise [initiative] powers greater than what the [Ohio] Constitution affords," an initiative may only propose "legislative action," as opposed to "administrative action."  *State ex rel. Ebersole v. Del. Cty. Bd. of Elections*, 20 N.E.3d 678, 684 (Ohio 2014) (per curiam).  "The test for determining whether an action is legislative or administrative is whether the action taken is one enacting a law, ordinance, or regulation, or executing a law, ordinance or regulation already in existence."  *Id.* (citation and internal quotation marks omitted).

No. 19-3196                    *Schmitt, et al. v. LaRose*                    Page 3

Under Ohio law, "[e]lection officials serve as gatekeepers, to ensure that only those measures that actually constitute initiatives or referenda are placed on the ballot." *State ex rel. Walker v. Husted*, 43 N.E.3d 419, 423 (Ohio 2015) (per curiam). Specifically, Ohio Revised Code (O.R.C.) § 3501.11(K) requires county boards of elections to "[r]eview, examine, and certify the sufficiency and validity of petitions," and to "[e]xamine each initiative petition . . . to determine whether the petition falls within the scope of authority to enact via initiative and whether the petition satisfies the statutory prerequisites to place the issue on the ballot as described [by Ohio law]." O.R.C. § 3501.38(M)(1) further provides that, "[u]pon receiving an initiative petition," the relevant board of elections "shall examine the petition to determine":

> Whether the petition falls within the scope of a municipal political subdivision's authority to enact via initiative, including, if applicable, the limitations placed by Sections 3 and 7 of Article XVIII of the Ohio Constitution on the authority of municipal corporations to adopt local police, sanitary, and other similar regulations as are not in conflict with general laws, and whether the petition satisfies the statutory prerequisites to place the issue on the ballot. The petition shall be invalid if any portion of the petition is not within the initiative power[.]

*Id*. § 3501.38(M)(1)(a). If a petition "falls outside the scope of authority to enact via initiative or does not satisfy the statutory prerequisites to place the issue on the ballot," neither the board of elections nor the Ohio Secretary of State may accept the initiative. *Id*. § 3501.39(A)(3). The ballot-initiative statutes do not set forth the legislative-administrative distinction. However, the Ohio Supreme Court has explained that, "[b]ecause [an initiative] on an administrative matter is a legal nullity, boards of elections have not only the discretion but an affirmative duty to keep such items off the ballot." *Walker*, 43 N.E.3d at 423 (citation omitted). "It necessarily follows that the boards have discretion to determine which actions are administrative and which are legislative." *Id*.

When a board of elections declines to place an initiative on the ballot on the basis that it proposes an administrative action, the proponent has no statutory right to immediate judicial review. Instead, the proponent must seek a writ of mandamus in Ohio state court requiring the board of elections to put the initiative on the ballot. To show entitlement to mandamus relief, the petitioner must prove by clear and convincing evidence: "(1) a clear legal right to the requested relief, (2) a clear legal duty on the part of the board members to provide it, and (3) the lack of an

adequate remedy in the ordinary course of the law." *State ex rel. Bolzenius v. Preisse*, 119 N.E.3d 358, 360 (Ohio 2018) (per curiam) (citation omitted). In reviewing a decision by a board of elections, an Ohio court may only issue the writ if the board members "engaged in fraud or corruption, abused their discretion, or acted in clear disregard of applicable legal provisions." *Id.* Typically, the "proximity of the [next] election" satisfies the requirement that there be no adequate remedy in the ordinary course of the law. *See, e.g.*, *State ex rel. Harris v. Rubino*, 119 N.E.3d 1238, 1246 (Ohio 2018); *Ebersole*, 20 N.E. at 491.

In early 2018, Plaintiffs William Schmitt and Chad Thompson submitted two proposed ballot initiatives to the Portage County Board of Elections (the Board). The initiatives eliminated criminal penalties associated with possession of marijuana in Garrettsville and Windham, two villages within Portage County, by abolishing criminal fines, court costs, and consequences related to driver's licenses. Although the proposed initiatives met Ohio's statutory prerequisites—each addressed only a single subject and contained the requisite number of signatures—the Board declined to certify the petitions. In an August 21, 2018 email to Plaintiffs, a representative of the Board explained that the initiatives were rejected because the Board deemed them administrative, rather than legislative:

> Reviewing the language in the proposals presented by the Village of Garrettsville and the Village of Windham, the $0 fine and no license consequences are administrative in nature. The $0 court costs is administrative in nature and is an impingement on the judicial function by a legislature. Accordingly, as the Garrettsville Village and Windham Village petitions deal with subject matter that is not subject to the initiative process, the Board of Elections, in its discretion, has chosen not to certify these issues to the ballot.

(R. 1-4, PID 35.)

Rather than petitioning for mandamus relief, Plaintiffs filed this action, bringing facial and as-applied challenges to the Ohio ballot-initiative statutes under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution. Plaintiffs allege that the statutes impose a prior restraint on their protected political speech, and that the ballot-initiative process must therefore comply with the procedural safeguards set forth in *Freedman v. Maryland*, 380 U.S. 51 (1965). Because the process fails to provide de novo judicial review of a board's decision, Plaintiffs argued, it fails to satisfy the *Freedman* requirements. Plaintiffs

sought a temporary restraining order and preliminary injunction against the Portage County Board of Elections members Craig Stephens, Patricia Nelson, Doria Daniels, and Elayne Cross, as well as then-Ohio Secretary of State Jon Husted.

After a hearing, the district court issued a temporary restraining order directing the Ohio Secretary of State and the Portage County Board of Elections to place both initiatives on the ballot for the November 2018 election. *Schmitt v. Husted*, 341 F. Supp. 3d 784 (S.D. Ohio 2018). Applying the balancing test set forth in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), the district court determined that the Plaintiffs' right to ballot access was impermissibly burdened by the statutory framework:

> Recognizing [the state's interest in regulating elections], the Court finds no legitimate state interests in preventing an adequate legal remedy for petitioners denied ballot access by a board of elections. While the availability of mandamus relief is essentially a judicially imposed remedy when the law does not otherwise provide one, the high burden on petitioners to prove entitlement to an extraordinary remedy is no substitute for de novo review of the denial of a First Amendment right.[1]

*Schmitt*, 341 F. Supp. 3d at 791. The district court later converted the temporary restraining order to a preliminary injunction that would expire the day after the election. On election day, the two proposed ordinances met different fates; the Windham initiative passed by a vote of 237 to 206, but the Garrettsville initiative failed 471 to 515.

After the election, the district court ordered additional briefing on Plaintiffs' facial challenge.[2] Plaintiffs maintained that the ballot-initiative statutes constituted a prior restraint in violation of the First Amendment "because [they] vest[] discretion in local election officials to select initiatives for ballots without providing timely and meaningful judicial review." (R. 32, PID 240.) Plaintiffs alternatively argued that the statutes authorized content-based review by

---

[1] The district court did not identify the source of the asserted right to de novo judicial review.

[2] We note that Plaintiffs' as-applied challenge is moot. Under Article III, we "may adjudicate only actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (citation omitted). The district court enjoined the Secretary of State to place the Plaintiffs' initiatives on the Portage County ballots, and the election was conducted in November 2018. The State made clear at oral argument that it does not seek to relitigate the district court's decision on the as-applied challenge. Accordingly, we will not consider it here, and review the district court's permanent injunction only as to the facial challenge.

No. 19-3196                          *Schmitt, et al. v. LaRose*                          Page 6

local boards of elections and were therefore subject to strict scrutiny. Ohio, on the other hand, argued that the ballot-initiative statutes were not susceptible to a First Amendment challenge because they merely set forth the process by which legislation is made, and therefore did not implicate any expressive interests. Ohio also argued that even if the First Amendment is implicated, the state's interests in regulating elections, reducing voter confusion, and simplifying the ballot all justify the alleged infringement on Plaintiffs' constitutionally protected interests.

The district court found that Plaintiffs were entitled to de novo review of the denial of their ballot initiative, and issued a permanent injunction barring the Ohio Secretary of State "from enforcing the gatekeeper function in any manner that fails to provide a constitutionally sufficient review process to a party aggrieved by the rejection of an initiative petition." *Schmitt v. LaRose*, 2019 WL 1599040, at *2 (S.D. Ohio Apr. 15, 2019). Notably, the district court did not analyze Plaintiffs' claim under the First Amendment, but rather under procedural due process. This approach had no basis in the pleadings or arguments below; the complaint did not separately state a procedural due process claim, and the parties' supplemental briefing did not invoke due process. On appeal, neither party defends the district court's analysis in its order granting the permanent injunction. The State disputes the merits of the procedural due process claim, and Plaintiffs insist their claim is founded only on First Amendment law. Because Plaintiffs did not raise a procedural due process argument below, and did not address it in their appellate briefing, we would ordinarily deem the issue waived. *See Watson v. Cartee*, 817 F.3d 299, 302 (6th Cir. 2016). However, we may affirm a district court's injunction order for any reason supported by the record. *McGirr v. Rehme*, 891 F.3d 603, 610 (6th Cir. 2018). Accordingly, we will evaluate Plaintiffs' claim under both the First Amendment and procedural due process.

## II.

"[A] party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer 'continuing irreparable injury' for which there is no adequate remedy at law." *Am. Civil Liberties Union of Ky. v. McCreary County*, 607 F.3d 439, 445 (6th Cir. 2010) (quoting *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 602 (6th Cir. 2006)). When evaluating a district court's grant of a permanent injunction, we review factual

No. 19-3196                         *Schmitt, et al. v. LaRose*                         Page 7

findings for clear error, legal conclusions de novo, and the scope of injunctive relief for abuse of discretion. *Id.* The parties do not dispute the underlying facts; the only issue is whether Plaintiffs suffered a violation of their First Amendment rights.

## III.

### A.

Plaintiffs urge us to view the ballot-initiative statutes as imposing a prior restraint on political speech. "A prior restraint is any law 'forbidding certain communications when issued in advance of the time that such communications are to occur.'" *McGlone v. Bell*, 681 F.3d 718, 733 (6th Cir. 2012) (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)). "Prior restraints are presumptively invalid because of the risk of censorship associated with the vesting of unbridled discretion in government officials and the risk of indefinitely suppressing permissible speech when a licensing law fails to provide for the prompt issuance of a license." *Bronco's Entm't, Ltd. v. Charter Twp. of Van Buren*, 421 F.3d 440, 444 (6th Cir. 2005) (citation and internal quotation marks omitted). In *Freedman v. Maryland*, the Supreme Court articulated three procedural safeguards necessary for a system of prior restraint to survive constitutional challenge. 380 U.S. at 57–59.

> First, the decision whether or not to grant a license must be made within a specified, brief period, and the status quo must be preserved pending a final judicial determination on the merits. Second, the licensing scheme must also assure a prompt judicial decision, to minimize the deterrent effect of an interim and possibly erroneous denial of a license. Third, the licensing scheme must place the burden of instituting judicial proceedings and proving that expression is unprotected on the licensor rather than the exhibitor.

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville*, 274 F.3d 377, 400 (6th Cir. 2001) (discussing *Freedman*, 380 U.S. at 57–59) (internal citations and quotation marks omitted). Plaintiffs assert that because the ballot-initiative statutes delegate authority to boards of elections to review proposed initiatives prior to the election, the statutes amount to a prior restraint, and, consistent with *Freedman*, Ohio must provide de novo judicial review of a board's decisions.

We conclude, however, that the ballot-initiative process here is not a prior restraint. The fundamental objection to systems of prior restraint is that they create a risk of government

No. 19-3196                        *Schmitt, et al. v. LaRose*                        Page 8

censorship of expressive activity.  *See, e.g.*, *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988) ("At the root of this long line of precedent is the time-tested knowledge that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship.") Accordingly, prior-restraint challenges typically emerge from licensing schemes that directly target core expressive conduct and "authorize a licensor to pass judgment on the content of speech." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322 (2002).  *See City of Lakewood*, 486 U.S. at 750 (permit required for placement of newspaper racks on public property); *McGlone*, 681 F.3d at 718 (advance-notice requirement for obtaining permission to speak on campus); *Deja Vu*, 274 F.3d at 377 (licensing scheme for nude dance clubs); *Freedman*, 380 U.S. at 61 (censorship of obscene films).  Ohio's ballot-initiative laws, in contrast, do not directly restrict core expressive conduct; rather, the laws regulate the process by which initiative legislation is put before the electorate, which has, at most, a second-order effect on protected speech.  In other words, the statutes enable boards of election to make "structural decisions" that "inevitably affect[]—at least to some degree—the individual's right to speak about political issues and to associate with others for political ends." *John Doe No. 1 v. Reed*, 561 U.S. 186, 212 (2010) (Sotomayor, J., concurring) (quoting *Anderson*, 460 U.S. at 788) (internal quotation marks omitted).  Regulations like these are "a step removed from the communicative aspect" of core political speech, and therefore do not involve the same risk of censorship inherent in prior-restraint cases.  *Id.* at 212–13 (citation omitted).

Moreover, although the Supreme Court has acknowledged that a person or party may express beliefs or ideas through a ballot, it has also stated that "[b]allots serve primarily to elect candidates, not as forums for political expression." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363 (1997) (citing *Burdick*, 504 U.S. at 438).  As a result, the heightened procedural requirements imposed on systems of prior restraint under *Freedman* are inappropriate in the context of ballot-initiative preclearance regulations.  *See also Aey v. Mahoning Cty. Bd. of Elections*, 2008 WL 554700, at *6 (N.D. Ohio Feb. 26, 2008) ("Plaintiff fails to cite any authority in support of the proposition that prior restraint licensing analysis should be applied to a ballot access statute."); *Comm. to Impose Term Limits on the Ohio Supreme Court & to Preclude Special Legal Status for Members & Emps. of the Ohio Gen. Assembly v. Ohio Ballot*

No. 19-3196                    *Schmitt, et al. v. LaRose*                    Page 9

*Bd.*, 275 F. Supp. 3d 849, 861 (S.D. Ohio 2017) (holding that another aspect of Ohio's ballot initiative process, the "single subject rule," is not a prior restraint).

B.

Instead, we generally evaluate First Amendment challenges to state election regulations under the three-step *Anderson-Burdick* framework, in which we "weigh the character and magnitude of the burden the State's rule imposes on [Plaintiffs' First Amendment] rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons*, 520 U.S. at 358 (citations and internal quotation marks omitted). The first, most critical step is to consider the severity of the restriction. Laws imposing "severe burdens on plaintiffs' rights" are subject to strict scrutiny, but "lesser burdens . . . trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id.* (citations and internal quotation marks omitted). Regulations that fall in the middle "warrant a flexible analysis that weighs the state's interests and chosen means of pursuing them against the burden of the restriction." *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016) (citation and internal quotation marks omitted). At the second step, we identify and evaluate the state's interests in and justifications for the regulation. *Id.* The third step requires that we "assess the legitimacy and strength of those interests" and determine whether the restrictions are constitutional. *Id.*

We first examine whether the burden imposed by the Ohio ballot-initiative statutes is "severe." *Timmons*, 520 U.S. at 358. "The hallmark of a severe burden is exclusion or virtual exclusion from the ballot." *Grimes*, 835 F.3d at 574. Plaintiffs claim an injury from the lack of de novo review of the decisions of boards of elections; by requiring aggrieved petitioners to seek a writ of mandamus, argue Plaintiffs, the Ohio ballot-initiative process unduly hampers their right to political expression. We disagree.

We begin by making clear that Plaintiffs have never challenged the legitimacy of the legislative-administrative distinction or the state's right to vest in county boards of elections the authority to apply that distinction. Instead, Plaintiffs assert, and the district court found, a right

to de novo review of a board's decision. However, outside the context of *Freedman*'s requirements for a prior restraint, Plaintiffs have not identified the source of such a right.

But even accepting Plaintiffs' argument that the First Amendment requires de novo review of a board's decision, the Ohio case law suggests that petitioners receive essentially that. The Ohio Supreme Court's evaluation of the decisions of boards of elections shows no particular deference to the boards' decisions. And, although the standard for showing entitlement to mandamus is recited as "fraud or corruption, abuse of discretion, or clear disregard of the law," Plaintiffs have identified no case in which the Ohio Supreme Court questioned the legal determination of a board of elections but nevertheless deferred to its discretion. Rather, the cases show that notwithstanding the stated standard of review, the court considers the proposed initiative and makes an independent reasoned determination whether it is within the Ohio Constitution's grant of legislative authority. *See State ex rel. Langhenry v. Britt*, 87 N.E.3d 1216 (Ohio 2017) (proposed referendum financing bonds for refurbishment of arena is legislative because it "represents the adoption of a new policy and a new undertaking"); *State ex rel. Sensible Norwood v. Hamilton Cty. Bd. of Elections*, 69 N.E.3d 696, 179–80 (Ohio 2016) (initiative making marijuana possession a fifth-degree felony is not within legislative authority); *Ebersole*, 20 N.E.3d at 684 (initiative approving land development is administrative because it "complied with the preexisting requirements for the Downtown Business District . . . and did not require any zoning changes").

Indeed, at least one justice of the Ohio Supreme Court has questioned whether the standard of review for ballot-initiative challenges is actually closer to de novo. *State ex rel. Khumprakob v. Mahoning Cty. Bd. of Elections*, 109 N.E.3d 1184, 1192 (Ohio 2018) (Fisher, J., concurring in judgment) (explaining that although the court purports to follow an abuse-of-discretion standard, "we have also stated that we need accord no deference to a board of elections' interpretation of state election law" (quotation omitted)). If there is any actual distance between the de novo standard of review Plaintiffs demand and the mandamus review provided by the Ohio Supreme Court, it is hardly significant enough to result in "virtual exclusion" from the ballot. We also note that because Ohio Supreme Court rules provide for expedited briefing and decision in election cases, aggrieved citizens who challenge an adverse

decision are able to seek timely redress. The ballot-initiative statutes are thus not subject to strict scrutiny based on a severe burden.[3] *Timmons*, 520 U.S. at 358.

Having determined that the restriction imposed by the ballot-initiative process is not severe and does not trigger strict scrutiny, we also conclude that the burden is not so minimal as to warrant rational-basis review. A burden is minimal when it "in no way" limits access to the ballot. *Grimes*, 835 F.3d at 577. Here, however, boards of elections wield the discretionary authority to decline to certify initiatives, and the burden thus falls on the aggrieved proponent to obtain mandamus relief in order to vindicate his or her interest. It is reasonable to conclude that the cost of obtaining legal counsel and seeking a writ of mandamus disincentivizes some ballot proponents from seeking to overturn the board's decision, thereby limiting ballot access. As a result, the burden imposed by the Ohio ballot-initiative process is somewhere between minimal and severe, and we engage in a flexible analysis in which we weigh the "burden of the restriction" against the "state's interests and chosen means of pursuing them." *Id*. at 574 (citations omitted).

At the second step of *Anderson-Burdick* we consider the State's justifications for the restrictions. *Id*. The Supreme Court has explained that, in structuring elections, "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce

---

[3]Plaintiffs also attempt to invoke strict scrutiny on the ground that the ballot-initiative statutes are content-based restrictions. But Plaintiffs have made clear in the district court and on appeal that they "do not challenge Ohio's ability to limit the subject matter of its initiatives." (R. 19, PID 136.) Instead, the focus of Plaintiffs' challenge is the asserted inadequacy of the review afforded to the boards' discretionary judgments. This aspect of the ballot-initiative statutes is plainly content-neutral. Moreover, the mere fact that the legislative-administrative distinction is directed to the content of an initiative does not necessarily make it content based such that it triggers strict scrutiny. *Cf. Committee to Impose Term Limits on the Ohio Supreme Court & to Preclude Special Legal Status for Members & Emps. of the Ohio Gen. Assembly v. Ohio Ballot Bd.*, 885 F.3d 443, 447 (6th Cir. 2018). The rule applies without regard to the subject matter or viewpoint of the initiative.

Further, the main case Plaintiffs rely upon in discussing whether the ballot-initiative statutes are content-based is largely inapposite. Plaintiffs rely primarily on the Supreme Court's recent decision in *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018). In that case, the Court held that Minnesota's ban on wearing political apparel at polling places on election day violated the First Amendment. *Id.* at 1892. However, the Court was not concerned with whether the ban was content-based. Rather, the Court was concerned with "[t]he discretion election judges exercise[d] in enforcing the ban" given the lack of "objective workable standards" for what constituted political apparel. *Id.* at 1891. *Mansky* thus does not explain whether Plaintiffs' challenge targets a content-based restriction. And in any event, *Mansky* involved a restriction on core political speech, in which "the whole point of the exercise [was] to prohibit the expression of political views." *Id.* at 1891. As noted earlier, this case does not involve core expressive conduct; "the whole point of the exercise" is preventing the overcrowding of ballots. *Id.* *Mansky*'s salience is questionable in this context.

election- and campaign-related disorder." *Timmons*, 520 U.S. at 358; *see also John Doe No. 1*, 561 U.S. at 186 ("The State's interest in preserving the integrity of the electoral process is undoubtedly important."); *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 191 (1999) ("States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process.") We have previously stated that states have a strong interest in "ensuring that its elections are run fairly and honestly," as well as in "maintaining the integrity of its initiative process." *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 297 (6th Cir. 1993). Further, a state may legitimately "avoid[] overcrowded ballots" and "protect the integrity of its political processes from frivolous or fraudulent candidacies." *Jolivette v. Husted*, 694 F.3d 760, 769 (6th Cir. 2012) (quoting *Bullock v. Carter*, 405 U.S. 135, 145 (1972)). Here, Ohio's interest is in "ensur[ing] that only ballot-eligible initiatives go to the voters" because "[k]eeping unauthorized issues off the ballot reduces the odds that an initiative is later held invalid on the ground that the voters exceeded their authority to enact it." (Appellant Br. at 49.) Ohio also contends it has an interest in maintaining voter confidence in the electoral process. Plaintiffs do not dispute these interests, and we find that they are legitimate and substantial.

At the third step of *Anderson-Burdick* we assess whether the State's restrictions are constitutionally valid given the strength of its proffered interests. Again, Plaintiffs do not contest that Ohio's interests in avoiding ballot overcrowding and safeguarding the integrity of the initiative process justify the administrative-legislative distinction and do not argue that the board-of-elections certification process is otherwise unconstitutional. Rather, they challenge the adequacy of the judicial review of such decisions. As explained above, however, because the Ohio Supreme Court recognizes a proponent's right to seek mandamus review of a board of elections' decision not to place an initiative on the ballot and the court performs what is essentially a de novo review of the legal issue whether an initiative is within the municipality's initiative power, the absence of a statutory de novo appeal of right does not impose a significant or unjustified burden on initiative proponents' First Amendment rights. Although the State's chosen method for screening ballot initiatives may not be the least restrictive means available, it is not unreasonable given the significance of the interests it has in regulating elections.

Plaintiffs' First Amendment challenge thus fails.

## IV.

We next evaluate whether the ballot-initiative statutes violate procedural due process. The Fourteenth Amendment provides, in part, that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV § 1.  To establish a claim of procedural due process, a plaintiff must show that (1) he or she had a life, liberty, or property interest protected by the Due Process Clause; (2) he or she was deprived of this protected interest; and (3) the state did not afford adequate procedural rights.  *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014) (citation omitted).

As noted, Plaintiffs did not raise a procedural due process claim below.  Nevertheless, the district court concluded that Plaintiffs had a protected "right to participate in Ohio's initiative process with . . . adequate review in the courts of Ohio."  (R. 37, PID 291.)  According to the district court, this liberty interest derives from state law; the district court reasoned that because Ohio established a ballot-initiative process, it is constitutionally bound not to "restrict the process in any manner" that would violate due process.  (*Id*. at PID 290 (citing *Taxpayers United*, 994 F.2d at 295).)

We need not decide whether Ohio has created a constitutionally protected liberty interest, however, because it is clear that the State affords aggrieved ballot-initiative proponents adequate procedural rights through the availability of mandamus relief in the state courts.  This court has previously found that state mandamus is a satisfactory post-deprivation remedy for the purposes of procedural due process.  *See Kahles v. City of Cincinnati*, 704 F. App'x 501, 507 (6th Cir. 2017) ("[P]laintiffs were able to seek a writ of mandamus in the state-court system to challenge any alleged abuse of discretion on the part of the City's medical director. . . . The plaintiffs thus received the process to which they were due."); *Martinez v. City of Cleveland*, 700 F. App'x 521, 522–23 (6th Cir. 2017) ("Because Martinez had [state mandamus relief] available to him, no due-process violation occurred.").  And although the district court held that only de novo review will suffice, due process does not mandate any particular standard of review.  *See Miller v. Francis*, 269 F.3d 609, 621 (6th Cir. 2001) ("Miller does not cite, nor are we aware of, any Supreme Court precedent vesting him with a procedural due process right to a particular standard of appellate review in the state courts.").

No. 19-3196                     *Schmitt, et al. v. LaRose*                     Page 14

Plaintiffs therefore cannot state a procedural due process claim, and the district court erred in concluding otherwise.

## V.

For the reasons stated above, we **REVERSE** the district court's order and **VACATE** the permanent injunction.

No. 19-3196 *Schmitt, et al. v. LaRose* Page 15

---

## CONCURRING IN PART AND IN THE JUDGMENT

---

JOHN K. BUSH, Circuit Judge, concurring in part and concurring in the judgment. I agree with the Majority that the Ohio legislative authority statutes[1] do not violate either the First Amendment as incorporated by the Fourteenth Amendment or the Due Process Clause of the Fourteenth Amendment. I join Parts I, II, and IV of the majority opinion, but, as explained below, my reasoning differs from the remainder of the Majority's analysis. It is arguable that Ohio's legislative authority statutes do not regulate "speech" within the meaning of the First Amendment at all because they concern only election mechanics. But even assuming that state-referendum laws regulate First Amendment speech, regulations of the nature at issue here do not warrant heightened scrutiny under that constitutional provision. States are free to fashion rules of election mechanics that are content-neutral and do not discriminate against any particular point of view, including rules that affect the types of matters that may be subject to popular initiatives, without running afoul of the First Amendment.

### A.

To understand why the First Amendment either is not implicated at all or, if it is, imposes no heightened scrutiny here, we should bear in mind what the Ohio legislative authority statutes do and *do not* regulate. *Cf. John Doe No. 1 v. Reed*, 561 U.S. 186, 212 (2010) (Sotomayor, J., concurring) ("In assessing the countervailing interests at stake in this case, we must be mindful of the character of initiatives and referenda. These mechanisms of direct democracy are not compelled by the Federal Constitution. It is instead up to the people of each State, acting in their sovereign capacity, to decide whether and how to permit legislation by popular action."). First, these statutes do not regulate a citizen's ability to advocate for a proposed initiative or regulate any speech surrounding the issue on the ballot. Second, these statutes only address proposed

---

[1]I refer to the Ohio statutes at issue, O.R.C. §§ 3501.11(K)(1)–(2), 3501.38(M)(1)(a), 3501.39(A), by using the Ohio Secretary of State's nomenclature: "Ohio's legislative authority statutes." Also, given the function these statutes serve to ensure that a proposed initiative "falls within the scope of authority to enact via initiative," Ohio Revised Code § 3501.11(K)(2), I sometimes refer to these statutes as the "gatekeeper" provisions.

initiatives.  They do not regulate an individual's ability to appear on the ballot as a candidate for any position (as would a ballot-access provision).

As such, I would characterize these gatekeeper provisions as laws regulating election mechanics.  That is, these statutes ensure that certain eligibility requirements are met before an initiative is formally certified for the ballot and voted on by the people.  The eligibility regulation at issue in this case is a requirement that an initiative pertain to only "legislative action," not "administrative action."  *State ex rel. Ebersole v. Del. Cty. Bd. of Elections*, 20 N.E.3d 678, 684 (Ohio 2014) (per curiam).  This requirement, in turn, implements separation-of-powers principles under Ohio state constitutional law by ensuring that laws passed through popular initiatives are only legislative, as opposed to administrative, in nature.  *See* Ohio Const. art. II, § 1f ("The initiative and referendum powers are hereby reserved to the people of each municipality on all questions which such municipalities may now or hereafter be authorized by law to control by legislative action . . . .");  *State ex rel. Walker v. Husted*, 43 N.E.3d 419, 423 (Ohio 2015) (per curiam) ("Election officials serve as gatekeepers, to ensure that only those measures that actually constitute initiatives or referenda are placed on the ballot.  For example, the right of referendum does not exist with respect to a measure approved by a city counsel acting in an administrative, rather than legislative, capacity." (citation omitted)).

## B.

The Supreme Court has not addressed the precise scope of the First Amendment interests, if any, that are implicated by laws that regulate only the mechanics of the initiative process.  The closest Supreme Court precedent is *Meyer v. Grant*, 486 U.S. 414 (1988), which found a First Amendment violation when a Colorado statute criminalized the compensation of petition circulators for gathering citizens' signatures for ballot initiatives.  *Id.* at 415–16.  The Colorado law limited "the number of voices who will convey" the message and also the initiative supporters'  "ability to make the matter the focus of statewide discussion."  *Id.* at 422–23.  But *Meyer* is not completely on all fours with the facts in our case.  The Colorado statute in *Meyer* targeted Coloradans' ability to advocate for initiative petitions, which amounted to regulation of political speech.  The Ohio legislative authority statutes affect no such regulation.

No. 19-3196 *Schmitt, et al. v. LaRose* Page 17

Furthermore, the Court's precedents in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), though concerning election regulation, similarly do not address the key question raised in this case: is the First Amendment impinged upon by statutes regulating the election mechanics concerning initiative petitions?  In those cases, the Court reviewed challenges to State laws that sought to limit a candidate's ability to appear on the ballot or otherwise limited a voter's ability to "write-in" candidates. *See Anderson*, 460 U.S. at 793–95, 805–06 (holding that Ohio statute requiring independent candidates to file statements of candidacy by March to appear on November ballot was unconstitutional); *Burdick*, 504 U.S. at 441–42 (holding that Hawaii's prohibition on write-in voting did not violate the challengers' freedoms of expression and association).  Indeed, this circuit has generally limited the application of *Anderson* and *Burdick* to freedom-of-association challenges to ballot access laws—i.e., laws that burden candidates from appearing on the ballot.  *See Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 586 (6th Cir. 2006) ("The first step under the *Anderson/Burdick* framework is to determine whether this burden on the associational rights of political parties is 'severe.'" (footnote omitted)); *see also Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 572–73, 574 (6th Cir. 2016); *Green Party of Tenn. v. Hargetti*, 767 F.3d 533, 545 (6th Cir. 2014); *cf. Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 334 (6th Cir. 2016).

Here, by contrast, Appellees are not asserting that the Ohio legislative authority statutes violate their freedom-of-association rights or their right to vote.  The Ohio laws at issue concern the regulation of the initiative petition—i.e., the process through which the people act in their sovereign capacity to legislate directly.  Thus, we should look to authorities that address the State's ability to regulate its initiative process and ensure that all requirements are met before an initiative is certified for the ballot.  This brings us to the most relevant case from our circuit, *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291 (6th Cir. 1993).

In *Taxpayers United*, this court reviewed a Michigan statute requiring that each initiative petition have a certain number of valid signatures from registered voters before the initiative could appear on the ballot.  994 F.2d at 293.  The challengers of that statute argued that "they had been denied their right to vote and their rights to assemble and to engage in political speech," after the Michigan Board reviewed the challengers' initiative petition and concluded that the

challengers failed to obtain the requisite number of signatures.  *Id.* at 294.  This court held that the challengers' First Amendment free speech rights and political association rights were not "impinged" by the statute.  *Id.* at 297.  The *Taxpayers United* court reasoned that "[b]ecause the right to initiate legislation is a wholly state-created right, we believe that the state may constitutionally place nondiscriminatory, content-neutral limitations on the plaintiff's ability to initiate legislation."  *Id.* at 297.

Our court noted that, "although the Constitution does not require a state to create an initiative procedure, if it creates such a procedure, the state cannot place restrictions on its use that violate the federal Constitution."  *Id.* at 295; *see also Meyer*, 486 U.S. at 424.  But, because Michigan's regulation did not regulate the challengers' speech on the basis of content, we determined that "it is constitutionally permissible for Michigan to condition the use of its initiative procedure on compliance with content-neutral, nondiscriminatory regulations that are . . . reasonably related to the purpose of administering an honest and fair initiative procedure."  *Taxpayers United*, 994 F.2d at 297.  In short, the Michigan statute did not trigger heightened scrutiny under the First Amendment and survived rational-basis review.  *See id.*

In reaching this conclusion, the *Taxpayers United* court made a critical observation about the Michigan statute—that it did "not restrict the means that the plaintiffs can use to advocate their proposal."  *Id.*  Had Michigan's statute been directed toward the challengers' ability to advocate for their initiative, the statute would have failed strict-scrutiny review under the Supreme Court's precedent in *Meyer*.  *See Taxpayers United*, 994 F.2d at 295.  As this court explained, "the principle stated in *Meyer* is that a state that adopts an initiative procedure violates the federal Constitution if it unduly restricts the First Amendment rights of its citizens who support the initiative."  *Id.*  But because the Michigan statute at issue in *Taxpayers United* dealt "with methods used to validate and invalidate signatures of voters to an initiative petition," that law was not like the statute in *Meyer*, which "dealt with a limitation on communication with voters."  *Taxpayers United*, 994 F.2d at 295.  For its reasoning, this court did not address whether the Michigan statute regulated First Amendment speech.  *See id.* at 293–94, 296–97.  Instead, the court assumed that it did but nonetheless upheld the law under rational-basis review.  *See id.* at 296–97.  Thus, under *Taxpayers United*, statutes that, in a content-neutral and

non-discriminatory fashion, implement and ensure compliance with the eligibility requirements for citizen initiative petitions are subject, at most, to only rational-basis review under the First Amendment. *See Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 192 (1999) (citing *Taxpayers United* favorably for its holding).

Consistent with *Taxpayers United*, this court in *Committee to Impose Term Limits on the Ohio Supreme Court & to Preclude Special Legal Status for Members & Employees of the Ohio General Assembly v. Ohio Ballot Board*, 885 F.3d 443 (6th Cir. 2018) (hereinafter *Ohio Ballot Board*) upheld the constitutionality of Ohio's single-subject rule. *Ohio Ballot Board*, 885 F.3d at 446. Under that rule, an initiative petition may only contain "one proposed law or constitutional amendment." *Id.* at 445. The challengers asserted that the provision violated the First Amendment because it was a content-based speech restriction. *Id.* at 446–47. Relying on *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), the *Ohio Ballot Board* court concluded that "Ohio's single-subject rule is not content based," because it "applies to all initiative petitions, no matter the topic discussed or idea or message expressed." *Ohio Ballot Board*, 885 F.3d at 447. Once again, just as in *Taxpayers United*, this court did not address whether an election-mechanics law regulated First Amendment speech. *See Ohio Ballot Board*, 885 F.3d at 445–46. Instead, the court assumed the First Amendment was implicated and upheld the single-subject requirement applying rational-basis review.

## C.

*Taxpayers United* and *Ohio Ballot Board* align with decisions of the majority of other circuits that have addressed statutes relating to the regulation of election mechanics. These circuits have similarly concluded that non-discriminatory referendum regulations are, at most, subject to rational-basis review. *See Molinari v. Bloomberg*, 564 F.3d 587 (2d Cir. 2009) (holding referendum statutes are only subject to rational-basis review); *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082 (10th Cir. 2006) (en banc) (same); *Marijuana Policy Project v. United States*, 304 F.3d 82 (D.C. Cir. 2002) (same); *Dobrovolny v. Moore*, 126 F.3d 1111 (8th Cir. 1997) (same). *But see Angle v. Miller*, 673 F.3d 1122 (9th Cir. 2012) (holding referendum regulations imposing subject-matter restrictions are subject to heightened scrutiny); *Wirzburger v. Galvin*, 412 F.3d 271 (1st Cir. 2005) (same).

In *Walker*, the Tenth Circuit, sitting en banc, addressed a fundamental question that *Taxpayers United* and *Ohio Ballot Board* did not answer: whether election-mechanics laws ever regulate "speech" under the First Amendment. The Tenth Circuit indicated that the First Amendment may not be triggered by citizen-initiative regulations and, if it is, such regulations are subject to only lower scrutiny. In *Walker*, the election-mechanics law at issue was a Utah constitutional provision that imposed a requirement that any "legislation initiated to allow, limit, or prohibit the taking of wildlife . . . shall be adopted upon approval of two-thirds of those voting." 450 F.3d at 1086 (quoting Utah Const. art. VI, § 1(2)(a)(ii)). The Tenth Circuit held that the constitutional provision did not infringe upon the challengers' First Amendment rights because they were not implicated by laws of this nature. *Id.* at 1085. In reviewing whether the Utah provision was subject to heightened scrutiny, the *Walker* court defined a key distinction (just as this court did in *Taxpayers United*) between the types of election laws that were constitutionally permissible and those that were not: "The distinction is between laws that regulate or restrict the communicative conduct of persons advocating a position in a referendum, which warrant strict scrutiny, and laws that determine the process by which legislation is enacted, which do not." *Walker*, 450 F.3d at 1099–1100.

The *Walker* court reasoned that the First Amendment is not a vehicle for challenging regulations of the process that must be followed for legislation or popular initiatives to be enacted or adopted into law:

> Under the Plaintiffs' theory, every structural feature of government that makes some political outcomes less likely than others—and thereby discourages some speakers from engaging in protected speech—violates the First Amendment. Constitutions and rules of procedure routinely make legislation, and thus advocacy, on certain subjects more difficult by requiring a supermajority vote to enact bills on certain subjects. Those who propose, for example, to impeach an official, override a veto, expel a member of the legislature, or ratify a treaty might have to convince two-thirds of the members of one or both houses to vote accordingly. State constitutions attach supermajority requirements to a bewildering array of specific categories of legislation, [collecting specific examples]. These provisions presumably have the "inevitable effect" of reducing the total "quantum of speech" by discouraging advocates of nuclear power plants, general banking laws, or unauthorized state flags from bothering to seek legislation or initiatives embodying their views. Yet if it violates the First Amendment to remove certain issues from the vicissitudes of ordinary democratic

> politics, constitutions themselves are unconstitutional. Indeed, the Plaintiffs'
> theory would have the ironic effect of rendering the relief they seek in this
> litigation unconstitutional under the First Amendment: if it is unconstitutional to
> amend the Utah constitution to require a supermajority to approve a wildlife
> initiative, those who favor such an amendment would be less likely to engage in
> advocacy in its favor.
>
> No doubt the Plaintiffs are sincere in their many sworn statements that
> they find the heightened threshold for wildlife initiatives dispiriting, and feel
> "marginalized" or "silenced" in the wake of Proposition 5. Their constitutional
> claim begins, however, from a basic misunderstanding. The First Amendment
> ensures that all points of view may be heard; it does not ensure that all points of
> view are equally likely to prevail.

450 F.3d at 1100–01. Based on this reasoning, the Tenth Circuit upheld the election-mechanics provision at issue even though, on its face, the law concerned subject-matter limitations relating to the referendum process. *See id.* at 1103. The Tenth Circuit indicated that the election-mechanics provision did not fall within the purview of the First Amendment because it did not regulate speech within the meaning of that constitutional guarantee. *See id.* at 1101, 1103; *see also Molinari*, 564 F.3d at 600–01 ("[P]laintiffs here claim that their First Amendment rights are chilled because New York State law puts referenda and City Council legislation on equal footing, permitting the latter to supersede the former (and *vice versa*). As such, like in [*Walker*,] there is no restriction on plaintiffs' speech."). The Tenth Circuit held that rational-basis review was the highest level of constitutional scrutiny that was warranted and upheld the Utah constitutional provision on this basis. *See Walker*, 450 F.3d at 1104–05.

## D.

In reaching its holding, the Tenth Circuit rejected the reasoning of the First Circuit in *Wirzburger*, which recognized that an individual's First Amendment rights could be impermissibly burdened by a statute placing subject-matter limitations on popular initiatives. *See* 412 F.3d at 278–79. In *Wirzburger*, the First Circuit reviewed a challenge to provisions of the Massachusetts constitution that prohibited initiatives on two subjects: those calling for "public financial support for private primary or secondary schools," and those "relate[d] to religion, religious practices or religious institutions." *Id.* at 274–75 (quoting Mass. Const. art. 18; *id.* art. 48, pt. 2, § 2). The *Wirzburger* court declined to apply strict scrutiny because the

constitutional provision governing the initiative process was not "a direct restriction on the communicative aspect of the political process." *Id.* at 277. The First Circuit observed that even though the subject-matter exclusions "aim at preventing the *act* of generating laws and constitutional amendments about certain subjects by initiative," the speech restriction caused by the state constitution "is no more than an unintended side-effect." *Id.* The *Wirzburger* court, however, declined to apply the lowest level of scrutiny, instead applying intermediate scrutiny pursuant to *United States v. O'Brien*, 391 U.S. 367 (1968), because the regulation bore on the initiative process, which "manifest[ed] elements of protected expression." *See Wirzburger*, 412 F.3d at 278.

Applying the *O'Brien* test,[2] the First Circuit concluded that Massachusetts had "a substantial interest in maintaining the proper balance between promoting free exercise and preventing state establishment of religion" and "in restricting the means by which these fundamental rights can be changed." *Id.* at 279. The First Circuit concluded that because "the exclusions aim at preventing certain uses of the initiative process, not at stemming expression," the law did not concern the suppression of expression or speech. *Id.* Because the court could "see no other way in which Massachusetts could achieve its interest in safeguarding these fundamental freedoms in its Constitution from popular initiative," it found that the "restriction on speech is no more than is essential" and thus did not violate the First Amendment. *Id.*

In *Walker*, however, the Tenth Circuit took issue with the First Circuit's application of heightened scrutiny in *Wirzburger*. First, the Tenth Circuit suggested that the First Amendment was not even implicated by referendum regulations of the type at issue. *See Walker*, 450 F.3d at 1104. Additionally, the *Walker* court noted that it would be wholly inappropriate to strike down an election-mechanics law under intermediate or strict scrutiny because it "would be an especially egregious interference with the authority of 'We the People' to adopt constitutional provisions governing the legislative or initiative process." *See id.* at 1103. As the Tenth Circuit

---

[2]Under *O'Brien*, a regulation must satisfy the following four elements to be constitutional: (1) the regulation "is within the constitutional power of Government;" (2) "it furthers an important or governmental interest;" (3) "the governmental interest is unrelated to the suppression of free expression;" and (4) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 391 U.S. at 377.

No. 19-3196          *Schmitt, et al. v. LaRose*          Page 23

reasoned, heightened scrutiny would be problematic, as it could imagine few tasks "less appropriate for federal courts than deciding which state constitutional limitations serve 'important governmental interests' and which do not. . . . Under our form of government, the people and their representatives, and not judges, assume the task of determining which subjects should be insulated from democratic change." *Id.*

### E.

I find the *Walker* court's reasoning to be persuasive and another way to explain this court's holdings in *Taxpayers United* and *Ohio Ballot Board*. To be sure, our prior precedent did not involve an election-mechanics regulation that concerned subject-matter limitations for popular initiatives as in *Walker*. But, as *Walker* indicates, the First Amendment simply is not implicated by structural requirements for the adoption of such laws, and this conclusion aligns with our circuit's prior holdings.

I share the Tenth Circuit's concern that we, as judges, are ill-suited to determine whether or not a state advances an important governmental interest by limiting the subject-matter of its initiative petitions. Here, the people of Ohio and their elected representatives, through their state constitution and statutes, have determined that only "legislative actions" are within the municipal power and thus, that the subject of any initiative must be a legislative, rather than an administrative, matter. We are in no position to second-guess this rule. Just as the Tenth Circuit feared to tread into whether Utah's subject-matter limitations relating to the wildlife initiatives served an important governmental interest, so too are we ill-suited to address the importance of the state separation-of-powers principles implemented by Ohio through its legislative authority requirement for popular referenda.

Furthermore, this case is similar to *Walker*, *Taxpayers United*, and *Ohio Ballot Board* in that there is no contention here that the election-mechanics regulation at issue discriminates against any particular point of view. In *Walker*, the law imposed a two-thirds approval of voters as to *any* law that pertained to the taking of wildlife, regardless of whether it was for or against such practice. *See* 450 F.3d at 1087. Similarly, in *Taxpayers United*, there was no discrimination against any viewpoint by the requirement of a requisite number of registered voter

signatures for an initiative to be placed on the ballot. *See* 994 F.2d at 297. And in *Ohio Ballot Board*, the single-subject rule applied to all initiatives, regardless of their subject matter. 885 F.3d at 447–48. Likewise, here, the legislative authority statutes apply equally to all referenda, without regard to their subject matter.[3]

Thus, based on the logic of *Walker*, I question whether that the election-mechanics statutes at issue are even within the purview of the First Amendment. However, even assuming that they are, these statutes are constitutional under the rational-basis review applied in *Taxpayers United* and *Ohio Ballot Board*. Accordingly, there is no merit to Appellees' assertion that the legislative authority statutes are an unconstitutional prior restraint, given that Ohio either is not restraining any constitutionally protected speech or that, if it is, the restraint is nonetheless valid under rational-basis scrutiny. As I explain below, these provisions survive rational-basis review because they are content-neutral and non-discriminatory.

### F.

Consistent with this court's holding in *Taxpayers United*, the Ohio statutes satisfy rational-basis review because they are "nondiscriminatory, content-neutral limitations on the [Appellees'] ability to initiate legislation." 994 F.2d at 297. Indeed, consonant with Supreme Court precedent, the Ohio statutes at issue can be justified without reference to the content of the regulation. In *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015), the Court explained that "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." "Statutes that are not content based on

---

[3]In *Angle*, the Ninth Circuit also applied heightened scrutiny to a Nevada election-mechanics law, but one that, unlike the Utah statute in *Walker*, did not pertain to a subject-matter restriction. *See Angle*, 673 F.3d at 1126–27, 1133–34. The Ninth Circuit reviewed whether Nevada's constitutional requirement that initiative proponents "must obtain signatures from a number of registered votes equal to 10 percent of the votes cast in the previous general election" in each congressional district to have the initiative placed on the ballot violated the First Amendment. 673 F.3d at 1126. The Ninth Circuit rejected the plaintiffs' assertion that the rule imposed a "severe burden on communication between circulators and voters," *id.* at 1133, but nonetheless applied intermediate scrutiny to the Nevada law because it had the potential, though minimal, to "reduc[e] the total quantum of speech on a public issue," *id.* (alteration in original) (quoting *Meyer*, 486 U.S. at 423). The Ninth Circuit's application of heightened scrutiny to election-mechanics laws is inconsistent with the Sixth Circuit precedent discussed above. The Ninth Circuit's logic also is troubling because, as the Ohio Secretary of State notes, it would call into question "all subject matter restrictions on what Congress or state legislatures may legislate about" because "such restrictions make it harder for those subjects to become 'the focus of' national or 'statewide discussion.'" Appellant Br. at 38–39 (quoting *Angle*, 673 F.3d at 1126).

their face may still be considered content based if they 'cannot be justified without reference to the content of the regulated speech' or 'were adopted by the government because of disagreement with the message the speech conveys.'" *Ohio Ballot Board*, 885 F.3d at 447 (quoting *Reed*, 135 S. Ct. at 2227).

The Ohio legislative authority statutes easily clear this threshold because, by their very terms, they apply to each petition submitted for review. *See, e.g.*, O.R.C. § 3501.38(M)(1)(a) ("Upon receiving an initiative petition . . . concerning a ballot issue that is to be submitted to the electors of a county or municipal political subdivision, the board of elections shall examine the petition to determine: Whether the petition falls within the scope of a municipal political subdivision's authority to enact via initiative . . . ."). Moreover, the laws can be justified without reference to the content of the initiative petition, because, as explained by the Secretary, "[t]he challenged portion of the [laws] channel ballot-access decisions to county boards and then mandamus proceedings that ensure that the State can quickly and efficiently promote its legitimate interests in screening out ineligible administrative actions and simplifying the ballot." Reply Br. at 24.

It is true that the contents of the proposed initiative dictate its fate in one limited sense. *See* O.R.C. §§ 3501.38(M)(1)(a), 3501.39. Under the statutes, if the reviewer, either the Board of Elections or the Ohio Secretary of State, finds that the proposed initiative is outside the municipal power or is an administrative matter, then the proposed initiative will not be certified. By contrast, proposed initiatives that are within the municipal power and are legislative, assuming all other conditions are met, are certified to appear on the ballot. But despite the different treatment that proposed initiatives receive depending upon their legislative or administrative nature, Ohio's legislative authority statutes are nonetheless content-neutral for purposes of the First Amendment because (1) their application does not depend on "the topic discussed or the idea or message expressed," (2) they can "be justified without reference to the content of the regulated speech," and (3) they were not "adopted . . . because of disagreement with the message . . . convey[ed]." *Reed*, 135 S. Ct. at 2227; *Ohio Ballot Board*, 885 F.3d at 447. To put the point more concretely, based on the initiative that gave rise to this case, the Ohio legislative authority statutes do not regulate on the topic of marijuana possession in particular or

No. 19-3196            *Schmitt, et al. v. LaRose*            Page 26

operate to restrict any viewpoint, idea, or message on that topic. Rather, they simply regulate the manner in which *any* topic concerning *any* viewpoint, idea, or message may be presented to the voters for approval via the initiative process. Such regulation, though it involves analysis of the text of the initiative, is nonetheless content-neutral under the First Amendment. *See Taxpayers United*, 994 F.2d at 295 (holding Michigan Board's review of the contents of the petition signatures to determine whether they were valid and from registered voters was content-neutral and did not violate the First Amendment).

In light of this conclusion, whether the Ohio legislative authority statutes survive review turns on the neutral application of the statutes by the Board and the Secretary—that is, are they applied in a discriminatory or non-discriminatory manner? Had Appellees presented evidence that the Board of Elections treated their initiatives differently because of their position regarding marijuana advocacy, then their claims might have had some merit. But, in the absence of evidence that the legislative authority statutes were applied in a discriminatory manner, it follows that the Board applied the gatekeeper provisions in a content-neutral and non-discriminatory way and therefore in compliance with the First Amendment. Although the Board may make mistakes in reviewing petitions and determine that otherwise certifiable initiatives are administrative (as the Secretary acknowledged happened here, Oral Arg. at 38:02–07), that does not mean that Ohio's legislative statutes are discriminatory as to any point of view. Instead, it is a steadfast reminder that humans make errors and likely is the reason why Ohio provides petitioners the right to seek a writ of mandamus in the Ohio Supreme Court. And thus, Ohio's legislative authority statutes are nondiscriminatory.

Because "it is constitutionally permissible for [Ohio] to condition the use of its initiative procedure on compliance with content-neutral, nondiscriminatory regulations that are, as here, reasonably related to the purpose of administering an honest and fair procedure," the Appellees' "First Amendment claim is without merit." *Taxpayers United*, 994 F.2d at 297. For these reasons, therefore, I concur in the judgment of the Majority that the Ohio legislative authority statutes do not violate the First Amendment.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 19-3196

WILLIAM T. SCHMITT; CHAD THOMPSON;
DEBBIE BLEWITT,

     Plaintiffs - Appellees,

     v.

FRANK LAROSE, Ohio Secretary of State,

     Defendant - Appellant.

```
┌─────────────────────────────────┐
│            FILED                │
│         Aug 07, 2019            │
│      DEBORAH S. HUNT, Clerk     │
└─────────────────────────────────┘
```

Before:  CLAY, WHITE, and BUSH, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Columbus.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the order of the district court is REVERSED, and the permanent injunction is VACATED.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk